## UNITED STATES, on Petition of ALBRO, ex rel. GRABER, v. KARNUTH, U. S. Director of Immigration, et al.

Circuit Court of Appeals, Second Circuit.
January 7, 1929.

Nos. 215, 216.

Botsford, Mitchell, Albro & Weber, of Buffalo, N. Y. (Preston M. Albro, of Buffalo, N. Y., of counsel), for appellant.

Richard H. Templeton, U. S. Atty., of Buffalo, N. Y. (Richard A. Grimm, Asst. U. S. Atty., of Buffalo, N. Y., of counsel), for respondents.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge. These appeals will be considered in one opinion.

John Graber, a native of Roumania, alleging that he resides at Niagara Falls, Ontario, Canada, presented himself before the Special Board of Inquiry at Niagara Falls, N. Y., on December 7, 1927, claiming the right to pass to and from Canada while he was seeking employment in the United States without having obtained an immigration visa. He claimed that he was not an immigrant, but a subject of Canada, and did

not intend to reside in the United States, but was only desirous of finding work here. He was again rejected by the same board on April 5, 1928, because he was not in possession of a consular immigration visa, and because he was a person liable to become a public charge.

Both proceedings raised the question of his right to come and go, and the validity of General Order 86 promulgated by the Department of Labor June 1, 1927. He presented his passport, claiming that he was a nonimmigrant entitled to enter the United States for the purpose of seeking employment, and requested of the American consul at Niagara Falls, Ontario, his visa. This was refused. We held in United States on Petition of Albro ex rel. Cook v. Karnuth (C. C. A.) 24 F.(2d) 649, that the Jay Treaty of 1794 (8 Stat. 116), providing for a free temporary passage across the Canadian border, was in force and effect, and that the courts in construing the Immigration Act should conform to the provisions of that treaty, and by its provisions British subjects, residing in Canada, one of whom was seeking employment in the United States, were not immigrants within the meaning of Immigration Act of 1924, § 3 (8 USCA § 203), and that they were entitled to admission as temporary visitors for business purposes in accordance with the provisions of that Treaty. We said that "business," as therein used, was not limited to trading and merchandising, but embraced everything by which a man can be employed.

The American consul refused to visa the passport of this appellant because of paragraph 48 of the General Instructions, Consular, 1925, which provides: "Temporary visits, except under rule 8 of the Immigration Rules, July 1, 1925, for the purpose of performing labor for hire are not considered to be within the purview of section 3 (2) of the act. However, personal servants accompanying their employers who are tourists or business men visiting the United States on a temporary visit and leaving with them might be granted passport visas under the section."

This regulation is in substance a reiteration of General Order 86. The appellant, as a temporary visitor, was required to present to the immigration authorities the visa pursuant to the proclamation of the President, the last of which was issued on February 21, 1928, and as to nonimmigrants provides: "With the exceptions hereinafter specified, they must present passports or official documents in the nature of passports issued by the governments of the countries to which they owe allegiance, duly visaed by consular officers of the United States."

The President's authority to make passport regulations is found in the Act of May 22, 1918 (40 Stat. 559 [22 USCA § 223]), and is now in force by authority of the Act of March 2, 1921 (41 Stat. 1205, 1217 [22 USCA § 227]). Such regulations must be consistent with the provisions of the Immigration Law. Johnson v. Keating (C. C. A.) 17 F.(2d) 50. The failure of appellant, as an immigrant, to have his passport visaed by the American consul, is sufficient upon which to base a denial of his admission. United States ex rel. London v. Philips (C. C. A.) 22 F.(2d) 288. But he claims to be a subject of Canada because of his residence there, and therefore to be entitled to benefits of the Jay Treaty.

The question is therefore presented whether he was in fact a British subject within the meaning of the Jay Treaty. The Supreme Court considered the meaning of the word "subject," as used in the Immigration Law in Nagle v. Loi Hoa, 275 U. S. 475, 48 S. Ct. 160, 72 L. Ed. 381, a case arising under the Chinese Exclusion Act, providing that Chinese entering the United States shall "be identified * * * by the Chinese government, or * * * such other foreign government of which at the time such Chinese person shall be a subject." It was held that the word "subject" was used in its narrow sense, and indicated only those who by birth or naturalization owed permanent allegiance to the government issuing the certificate. In The Pizarro, 2 Wheat. 227, 4 L. Ed. 226, the court gave a broader meaning to the term "subject," and held it included "a person domiciled in a country, and enjoying the protection of its sovereign, is deemed a subject of that country. He owes allegiance to the country, while he resides in it, temporary, indeed, if he has not, by birth or naturalization, contracted a permanent allegiance, but so fixed that, as to other nations, he follows the character of that country, in war as well as in peace."

But what was said in the Nagle Case we think applies here, involving the question of immigration, where the word "subject" must be used in the narrower meaning. In Carlisle v. United States, 16 Wall. 147, 21 L. Ed. 426, it was pointed out that the citizen or subject owes absolute and permanent allegiance to his government and his sovereign, or at least until by some open and distinct act he renounces it and becomes a citizen or subject of another government or sovereign. To be sure, while domiciled within a country

he owes a local and temporary allegiance, which continues during the period of his residence. But a British subject, within the meaning of this treaty, means any person who owes permanent allegiance to the crown, and this is to be distinguished from the allegiance of an alien, who, because he is within the British dominion, owes temporary allegiance to the crown. Dicey on Conflict of Laws (3d Ed.) p. 167. This distinction finds support in the law of nations and is applicable to the treaty between the British Empire and the United States, which we are here considering. It follows that the court below properly dismissed the writ of habeas corpus and the complaint in the equity suit.

Order and decree affirmed.